Agenda number 4, case number 125954, People of the State of Illinois v. David Carter Mr. Sean William Collins-Dapleton for the appellant. Please proceed. Sean William Collins-Dapleton May it please the Court, Sean Collins-Dapleton on behalf of David Carter, who raises two claims before this Court today. First, other generic aggravated battery convictions can support an armed individual criminal conviction. And second, whether the police seizure of Mr. Carter was supported by a reasonable suspicion. The State concedes that the generic aggravated battery convictions used in this case cannot support Carter's armed individual criminal conviction, and thus this Court should reverse that conviction outright. The armed individual criminal statute requires the State to prove that an individual unlawfully possessed a firearm and had two or more qualifying prior convictions. These prior convictions must be either enumerated in the armed individual criminal statute or be forcible felonies as defined by that statute. When the State relies on a prior aggravated battery conviction, the aggravated battery must be either aggravated battery of a child or aggravated battery with a firearm, which are enumerated in the armed individual criminal statute, or must fit the definition of a forcible felony, which means the batteries must have caused great bodily harm, permanent disability, or permanent disfigurement. Now, in this case, the sole evidence of Mr. Carter's prior aggravated batteries consisted of information from Will County, which stated that Mr. Carter had been charged with two counts of Class III aggravated battery, that he had pled guilty to those counts and received a sentence of probation, and that probation was revoked, and he was sentenced to three years' imprisonment. There was no evidence presented that these aggravated or great bodily harm or permanent disability or disfigurement. Therefore, the State's evidence failed to prove that Mr. Carter had two qualifying convictions necessary to support the armed individual criminal charge. This Court should therefore reverse the armed individual criminal charge and remand the case for resentencing on the two merged counts of unlawful use of a weapon by a felon for possessing a firearm and a single bullet. As for Mr. Carter's claim that he was unreasonably he was seized without reasonable suspicion, the record shows that he was seized based on a hunch and not on reasonable suspicion. This case initiated when a person called the Chicago Office of Emergency Management and Communications and said they wished to remain anonymous. The person then said that they had seen a white man wearing a dark hoodie walking with two white women. The person said the man was swinging at the women and the man was – had a gun. The caller also said that the group was near 33rd and Wallace Streets. This information was relayed to two police officers on patrol. Within minutes of receiving that dispatch, went to that location. The officers saw no people matching the caller's descriptions. A few minutes later, the officers received another dispatch. This one stated that the caller now said that the group was at 3100 South Low, which is about two blocks north, one block west of that location. Within minutes, the officers drove to that location. Critically, they did not see the women who were the alleged victims of this battery or this assault. However, they did see a man, Mr. Carter, wearing a dark hoodie and walking in an alley with a hand on his waist. The police officers exited their car and commanded Mr. Carter to approach and place his hands on the car. Mr. Carter complied and at that point was seized by the officers. Now, this seizure lacked reasonable suspicion because, first of all, the – an important part of this information from this caller was that this man was involved in an assault. And yet, the women of this alleged assault were nowhere to be seen. And if – since that didn't pan out, it's questionable whether the information about the man having a gun was reliable. Secondly, there's – it's not per se illegal in Illinois to carry a concealed firearm. And there's no basis in the record for the caller's belief, knowledge – there's no knowledge – I'm sorry, there's no basis of knowledge for the caller's assertion that Mr. Carter was unlawfully carrying a weapon.  Have you raised that issue before, the Second Amendment issue? I – it was in – it was just – it was in our opening brief, yes. And it was just part of the totality of the circumstances that the officer would have known that it's lawful in Illinois to carry a concealed weapon. But also, the caller didn't describe a weapon, and the caller didn't provide any predictive information which would allow the – if confirmed, would have corroborated a tip. Should a 911 call be treated differently than an anonymous call? Perhaps somewhat, Your Honor, but in this case, we don't know if – first of all, the caller stated they wanted to be anonymous. And since the police didn't try to contact the caller, we have no idea if the caller had put in place – would have responded to a call from the police, or if they had put in – they've used techniques that would have made it harder for the police to contact them. We just don't know. Isn't it true that the calls are recorded and there's – it pinpoints a location, even if the caller doesn't give the name? It would have – it probably would have pinpointed a location, but this caller obviously was moving around the area because they saw these people at two different locations. If you're calling from your home and it's important that they track you to a place at home, that could be – that's obviously important. But in this case, the caller was on the move. So that's – there's no basis – there's no way to – there would have been no way to identify the caller easily since they were on the move. No, but it is a report of the location, whether they're on the move or not. Yes, it would have said they were, you know, first around 33rd and Wallace and later maybe around 3100 Lowe. Does it make a difference that two 911 calls were made, not just one? A second call was made, correct? Well – Giving them a different – giving the police a different location. It makes it clear that the caller really wanted the police – really wanted the police to find Mr. Carter. And there's no doubt the caller provided the police with enough information to identify Mr. Carter. The question is whether they provided enough information for the police to stop and search Mr. Carter. And I would – and I say no, of course. And I think that in this case, particularly because the tipster's information about the assault was not borne out. Other than the information in the phone calls, what information did the officer have about illegal activity going on? They simply – the officer simply said that he saw Mr. Carter with his hand on his waist. But the officer also said that when he had searched people's waistbands, he had found both contraband and innocent items in their waistbands. So that information cuts either way. It could be innocent conduct. It could have been a gun. But I think in this case, particularly since the information about the assault was not borne out, and then a police officer could have reasonably thought, well, maybe the caller may have fabricated the information about the assault and maybe about the gun as well, I should tread lightly here. And maybe before I just tell Mr. Carter to put his hands on my car, I could ask him, sir, I have – for example, I have information that a person matching your description was involved in an assault and is armed. Is either – or either of those things true. And depending on Mr. Carter's response, if he had said no, the officers could ask to frisk him or the officers could watch for any suspicious conduct that would provide them with reasonable suspicion for a terrorist act. That was not done in this case, obviously. They just told, get over here, put your hands on the car. If the officer had seen a gun, this gentleman's walking down the street, there's no women around, wouldn't that have been corroboration that this was – and he's dressed the same and – Well, absolutely. That's a whole different defense, Your Honor. If the gun is out, it doesn't matter if you have a concealed license or not, obviously. You can't brandish your gun on the streets, right? So, yes, absolutely. If he saw a gun, this was a whole different case. Yes, the officer testified based on his observations. He, in his experience, believed that he was carrying a weapon. So – and the trial court credited that testimony, correct? Well, yes, the officer believed he saw – he had seen people holding their waistbands and then concealing a gun, but he also said he had seen people holding their waistbands and not concealing guns. So that cuts both ways. And we get back again to the fact that the caller's information about the women did not pan out. And again, the officer, I think, has to be very cautious when a tipster's information is not borne out by the police investigation about proceeding to simply frisk the person, stop, seize, and frisk the person, when in this case, I think, there was another level, a reduced level of police intervention, such as communicating with Mr. Carter before simply seizing him. How do you say that the women aren't borne out when there could be a – there was a short passage of time when the defendant was observed, right? Well, that's true, Your Honor. But the caller – and the second call, the caller specifically said the group, the men and the women, were now at 3100 South Low. And officers were there within minutes. And, yes, of course, the women could have gone somewhere else. Or to the officer, the officer has to be thinking, I don't see the women. Maybe there's something up with this caller. And maybe I shouldn't just tell this citizen or this person here to just get up against my squad car. Maybe there's another way here that I can investigate this tip that is partially uncorroborated. But that touched on the Fourth Amendment's reasonableness. Why isn't it reasonable for the officer, after he – after they received this information, that this person was – had a gun and was swinging at the women, and then he sees a guy who matches the physical description and the clothing description, holding his waist like he's observed many times with people that have a gun, why isn't it reasonable for him to search him, put him up against the car and search him to make sure he doesn't have a weapon? Because reasonableness has to balance the interests of the police with the interests of our – of the people to be free of unreasonable searches and seizures. And, again, in this instance, when this anonymous tip – because at this point this is anonymous, they have no idea if they're going to be able to contact this person again – says this person's involved with an assault against two women and he's carrying a gun. And when they go to investigate, there are no women. So – What if the man – if you say – you posit that they could ask him to stop, right, and so forth. What if the guy walks away, just keeps on walking? Well, I think that could – I think that could be consistent with flight. I mean, you've told someone that you are – listen, we have information the person matching your description – I mean, they come in, it's a black car, the lights are shining on him, right, I mean, it's a pretty serious situation. And then you say, we have information that someone's told us that you have assaulted two women or a person matching your description and you have a gun. We need to investigate this, so please, can you cooperate with us? And if he just walks away, I think that's reasonable suspicion right there. It's akin to flight. I think that they have a right to investigate at that point. I just don't think they have a right to say stop and get against the car and is only partially corroborated under these circumstances. If he testified that sometimes I see people walking this way in their arm and then sometimes they're holding other things, contraband or other things, is that not an articulable suspicion that he might be on it, especially in light of the other evidence that he matches the description of this person who's assaulting the woman? Yes, Your Honor, but again, the tip itself is only partially corroborated. And so when you have a tip that is questionable, like this one was, and then you have innocent conduct, which could mean he was concealing a weapon, or it could mean he has an oversized cell phone, or he's just trying to keep up his pants, which are too large. Again, I think that counsels the police to be a little more cautious than simply telling the guy to get against the car and you're going to be frisked and searched. I think there's a third way here that the officer should have pursued. So what is the solution the police officer should have done? Like I said, I think the police officer should have told the individual that we have this information about a person matching your description and we need to investigate and can you cooperate with us. Would you consent to a search? Would you make sure, you know, make sure your hands are away from your body? We're going to have a conversation here rather than simply telling you to get up against the car. And if there are no further questions, I ask this Court to reverse Mr. Carter's armed robbery, armed habitual criminal conviction and remand for resentencing or, and in the alternative, to suppress the gun and bullet in his statement and reverse all those conditions. Thank you. Thank you, Mr. Collins. Mr. Mitchell, John Ness for the appellee. You may proceed. Good morning, Your Honors. It may please the Court. Assistant Attorney General Mitchell Ness on behalf of the people. The Fourth Amendment permits a police officer to conduct an investigatory stop if that officer has a reasonable suspicion that an individual has engaged or will engage in criminal activity. It's very clear that an anonymous tip can form the basis of that reasonable suspicion provided that the anonymous tip proves credible and such that the responding officer can credit the tip's central allegation. Here, the totality of the circumstances made the anonymous caller sufficiently reliable and Officer Lozada in this case was justified in relying on his allegation. For instance, the caller in this case provided a firsthand and contemporaneous account of the defendant's location, appearance, movements and actions, alleged that the defendant had recently assaulted two women and was carrying a gun and made that call through the 911 system. Upon arriving at the scene, Lozada independently corroborated nearly every aspect of that tip, including the allegation that the defendant was carrying a gun. Taken together, Lozada reasonably credited the caller's account, and therefore his decision to conduct an investigatory stop did not violate the Fourth Amendment. Counsel, what about the women? So wasn't that a simple part of the tip, an assault on the women, yet my understanding is that the women were never found? There's no indication from the record that the women were ever found. The defendant wants to rely heavily on the idea of the women not being there, and I think some of the questioning got to the natural response, which is that, of course, if two women were being assaulted, you would not stay with your assaulter for several minutes longer than you need to. And so if you look at the timeline, the original call comes in about 11, I think it was 1142, and obviously Lozada and his partner respond to the original location given by the anonymous caller. They don't see anybody there. They wait for an unknown period of time until the second call comes in, and then Lozada testified that two, three, four minutes later they arrive at the second location and they find the defendant walking in an alleyway. The fact that the women were not there was, at that point, I think irrelevant to Officer Lozada because he witnessed the defendant carrying a gun. At that point he's focused on the defendant and his and his partner's safety. Whether the women were on the street, not in the alley, and Officer Lozada and his partner, I suppose, could have separated to go try and find those women while they stopped the defendant is, I suppose, an option but not one that they deemed reasonable in the moment. Given the information that they had, the defendant was carrying a gun and their observation that the defendant was indeed carrying a gun. So at that point the idea that the women were not there was relevant because the rest of the call was corroborated and they were able to independently credit the anonymous caller's allegation that the assault had occurred. That also relies on the totality of the circumstances. The fact that the women were not there on its own does not undermine the rest of the circumstances. Lozada, in this case, knew that the caller had called and provided a contemporaneous tip, a firsthand tip meaning they had just seen what had happened and they were reporting it as it happened, and then the officers responded to the scene within minutes. I also think regarding the Second Amendment issue, it's not central to this case and it's not important to this case. The officers are allowed to conduct investigatory stops for crimes that have just occurred. In this case, that would be the assault. So whether or not Lozada believed that the defendant was carrying a gun illegally, he's still allowed to stop that defendant and investigate a crime that had just recently occurred. And that naturally then leads to the frisk, which is a completely separate issue and one which Defendant Sofarin's briefs has not challenged whether the frisk itself was justified. But once Lozada has decided to stop the defendant based on his reasonable suspicion that the assault had occurred, Terry also allows him to conduct a frisk before investigating further to secure his and his partner's safety. The central question here is whether there was enough evidence or enough circumstances to support the idea that the anonymous caller was telling the truth and that Officer Lozada could reasonably credit that allegation before engaging with the suspect. And as this Court highlighted in defense questioning, 9-1-1 calls are an important factor in that case. The Supreme Court has made clear that calls made through a 9-1-1 system are treated differently than just a truly anonymous tip, that the anonymity of those calls is somewhat reduced. And that's relevant to the officer's mindset at the time he's given that information. Whether he made efforts afterwards to try and find the anonymous caller, whether the anonymous caller's location was ever determined is, at that point, irrelevant. What's important is the officer's mindset at the time that he decided to make the stop and whether it was reasonable at that time. And the courts have made clear that a 9-1-1 call is to be treated as a factor of reliability. Should we be making distinctions between different 9-1-1 calls? Those made on a cell phone that may not be traceable, maybe a burner phone, so to speak, or a 9-1-1 call made from a landline at a house? I don't think so, Your Honor. I think it, in this case, somewhat highlights why in this case the 9-1-1 call, whether the anonymous caller gave his or her own number or not, the 9-1-1 system did record this anonymous caller's phone number. So I think that helps treat whether it be a cell phone or a landline. One way or another, we have some information by which we can go try to find that anonymous caller after the fact. I'm also not clear on the technology there. If they would be able to tell whether an anonymous call was on a cell phone or a landline, that would probably need to do further factual development on that issue. But, no, overall I don't think so. Thank you. Another important aspect of the reliability here, given the caller's allegation that the defendant was carrying a gun, was Luzzatto's corroboration of that fact. He did testify that he had seen in his 22 years hundreds of people holding their waistbands as if carrying a gun. It is true that he also testified that he'd seen people hold their waistbands and not be carrying guns, but he did not testify that he, in hundreds of situations, had seen individuals hold their waistbands as if they had guns and then it turned out they did not have guns. He simply testified that it's true he's seen people hold their waistbands and not have guns, but his testimony is unequivocal here that, for whatever reason, the way the defendant was holding his waistband led him and his years of experience to believe that this individual was carrying a gun. And then, finally, I would just point out that the defendant would prefer that this Court parse out all of the details individually and look at them separately to determine whether, on their own, they support reasonable suspicion. But, of course, that's not what this Court needs to do. This Court looks at the totality of the circumstances, adds up all of the details, the description, the fact that this call was firsthand and contemporaneous, that it came through the 911 system and that Officer Luzzatto corroborated significant details of it and puts them together to determine whether Officer Luzzatto, at that moment, had a reasonable suspicion to stop the defendant. If there are no further questions, I'd ask this Court to affirm the judgment of the appellate court regarding the motion to suppress and uphold defendant's conviction for unlawful use of a weapon by a felon and aggravated unlawful use of a weapon. Thank you, Mr. Ness. Mr. Collins-Stapleton, you may proceed. I just have one thing to say as a rebuttal here, is that if, as my opponent says, if these women were so concerned about getting away from Mr. Carter, sorry, I'm so used to wearing a mask all the time when I'm talking to people, if these women were so concerned with getting away from Mr. Carter since he was swinging at them, then why were they together with him for a whole three blocks? And, again, I think that that's a critical, the fact that the officer didn't see these women is a critical, is critical information for this Court's decision deciding whether or not there was reasonable suspicion to stop Mr. Carter. Thank you. Thank you, Mr. Collins-Stapleton. Case number 12595 for People v. David Carter is agenda, will be taken under advisement as agenda number four. Thank you, Mr. Collins-Stapleton and Mr. Ness, for your oral arguments this morning.